Curia, per Johnston, Ch.
This appeal has been twice extensively argned; first before all the Chancellors, and again in this court; and I have formed an unhesitating opinion upon all the points involved in the cause, and a majority of the court, concurring in it, have directed me to announce the conclusions to which they have come. If, in performing this duty, I do not take notice of all the topics to which our attention has been directed by counsel, this seeming neglect does not proceed, in the slightest degre, from insensibility to the uncommon research and ingenuity of their arguments, but from a persuasion that in a more limited view the subject will be seen in a clearer light.
In considering the questions presented, perhaps the most natural method will be to examine, in the first place, the claim of Guillemot and wife, the only accepting creditors; for if this demand should, upon investigation, prove invalid, it will be un-necesary to enquire into the validity of the assignment of June, 1840, since the assigned assets will, in the case I have supposed, be as effectually thrown open to the remaining creditors, who have not accepted, as if the assignment were formally set aside.
The claim we are now to examine, arises out of articles executed in Paris, immediately preceding, and in contemplation of, the marriage of Guillemot with the daughter of Lacoste. They were executed and registered with all the solemnities required by the laws of the country, and were subscribed not only by the affianced parties, but by Lacoste, the father of the intended wife, and by both the parents of the intended husband ; the parents on both sides mutually stipulating a portion of 40,000 francs, on behalf their children respectively, payable at their (the parents) pleasure, but bearing an annual interest of 5 per cent, until discharged.
The evidence is, that Lacoste’s credit was good at the time, and that he continued to honor his engagements, and was at the head of his business for several years afterwards, though he was indebted at the date of the articles, and eventually failed here, where they have never been registered. This cotemporaneous indebtedness, and this nonregistration, are the principal objections urged against the validity of Lacoste’s undertaking.
The general doctrine is reasonably settled, that the validity and construction of a contract are, throughout the world, to be *212 determined by the laws of the country where it was entered into ; Story Conñ. Laws, ch. 8, passim, (especially if, as in this instance, it was intended to be executed there,) though its lien and operation, and all priorities of right under it, are generally limited to that country — and in enforcing or executing it, the tribunals of other countries are not bound to give it any effect, so far as it may contravene the policy of their own States; Story Confl. Laws § 323-4-6
Mr. Charles Ledree, advocate of the Royal Court of Paris, whose examination was put in evidence at the hearing, testifies : “As a lawyer, I am well acquainted with the laws of France as they existed at the time; this contract is in due form, and its effect is to constitute a valid debt quoad Mr. Lacoste, of forty thousand francs, from the day of his daughter’s marriage.” “ It creates, in favor of the donee, a claim having equal rights with other creditors.” “ The laws of France provide, that in case of insolvency,” (supervening) “ voluntary debts, such as that constituted by the contract in question, have the same rights as any other debt of the insolvent, ’ and they are paid pro rata? “ The laws of France allow the same rights to donees of the insolvent, as they do to his other creditors; if there be not sufficient assets to pay all, each taires a share of the assets proportioned to his claim.” “ I can imagine no reason, ”he says, “ for paying Mr. Lacoste’s assets exclusively to his creditors, others than his daughter, except in case that Mr. Lacoste had failed before the date of the marriage contract.” “ An obligation contracted in these terms, constitutes a real contract, and the contemplated marriage is a sufficient consideration.” “When such a debt is contracted, it is,, like every other debt for a consideration, valid at its date.” ' “By the laws of France, a donation in consideration of an intended marriage, acquires the rank of a bona fide debt, and is equal in rank to any other debt.”
Mr. Paul DeJouvencel, advocate of the same court, referring to the answers of Mr. Ledree, said that he approved them entirely, and that he adopted them, as expressing his own opinions ; “ adding, only, that it was within his personal knowledge, that at the date of the marriage contract, Mr. Lacoste was at the head of his business, and did honor to his engagements.”
This is the evidence as to the validity and construction of the contract in question, and it leaves no room for doubt, that it is valid, and constitutes a debt to the extent of Mr. Lacoste’s engagement, dating from the marriage. Indeed the witnesses *? Ledree and Jouvencel, in other parts of their testimony which 1 have omitted, seem to go further, and to establish that the contract created a lien covering not only the then existing property, but extending to the subsequently acquired property of Lacoste. But I have not attended to this, because it is pretty clear that the allowing of a foreign lien is rather a question of policy. As observed by C. J. Marshall (Harrison vs. Sterry, 5 Cranch, 289, 298, and see 12 Wheat. 361-2) the law of the place where a contract is made, is, generally speaking the law of the contract; that is, it is the law by which the contract is expounded. But the right of priority forms no part of the contract itself. It is extrinsic, and rather a personal privilege dependent on the laws of the place where the property lies, and where the court sits which is to decide the cause.”
But if we were at liberty to decide the validity of Mr. La-coste’s engagement by our own law, we must come to the same result. There is no doubt that responsibilities incured by the opposite contracting parties form a sufficient consideration to support a contract. It may not bemecessary to inquire how far the venturing upon the conjugal relation, with all its cares, and dangers, and duties, by the intended wife, entitled her to insist on this principle of law as against her father, nor whether the assumption of the grave and multiform responsibilities of the relation by the husband, do not constitute him, in the best sense of the word, a purchaser of the benefits of the collateral contract, (a point well settled.) It is sufficient to observe that a full consideration arises, as against Lacoste, from the correlative and mutual obligation undertaken by the parents of Guillemot on the other side. But the objection that these articles were not duly recorded in this State remains to be considered.
It is said that this is a marriage-contract, and, as such, required to be published by registration here, and that for want of this statutory pre-requisite, we cannot give effect to it.
This contract rests not only on the marriage consideration, but upon the counter engagement of Guillemot’s parents : and if the former gives it the savour of a marriage contract, the latter would seem to entitle it to stand upon other grounds, and to free it from the necessity of registration. Bank vs. Brown, 2 Hill Ch. 558.
But I am disposed to enter into the very objection presented, and this rather as the end to which Mr. Lacoste looked, in this transaction, was manifestly the marriage of his daughter, and *214 the motive with which he entered into the contract, and accepted of the stipulation of the other parties, was to bring that marriage about, and provide for its consequences.
For the purpose, therefore, of meeting the question presented, it may be conceded that this is a marriage contract. It must be constantly borne in mind, however, that, as such, it is valid by the laws of France, where -it was made, and stands upon full consideration ; and that the only objection to it, is its non registration : an objection which, in the case of a foreign contract, cannot apply to its validity but only to its operation.
The question is, is its operation to be disallowed for mere want of registration 1 I think not.
As a contract not amounting to a settlement, this instrument does not fall within the provisions of the Act of 1823, 6 Stat. 213, but under the operation of the Act of 1785. (4 Stat. 656, 6 lb. 636.) For the understanding of the commentary which I shall make, the words of this latter statute must be closely attended to. “Whereas, the practice prevailing in this State, of keeping marriage contracts and deeds in the hands of those interested therein, hath been often times injurious to creditors and others, who have been induced to credit and trust such persons, under a presumption of their being possessed of an estate subject and liable to the payment of their just debts ; for remedy whereof, and to prevent such deceitful practices,
“ Be it enacted, &c., That on or before the first day of September next, all and every marriage contract, deed or settlement, now actually existing, after being duly proved, shall be recorded, or lodged in the Secretary’s office of this State, to be recorded; and where such contracts or marriage settlements, or the forties thereto, are without the limits of this State, then and in such case, the forties interested therein shall be allowed twelve months from the passing of this Act, to record, or lodge such contract as aforesaid in the office aforesaid. And all that shall hereafter be entered into for securing any part of the estate, real or personal, in this State, of any person or persons whomsoever, shall, within three months after the execution thereof, be duly proved, and in like manner be recorded, or lodged in the said office to be recorded, excepting such as shall be entered in without the limits of this State, which shall be recorded, or lodged to be recorded, in the said office, within twelve months from the date thereof: And in case any person or persons whomsoever, interested in such marriage deed, contract, or *215 settlement, shall neglect or refuse to record, or lodge the same, in the manner or within the times before mentioned, in the office aforesaid, to be recorded, then the same, in respect to creditors, shall be deemed, and is hereby declared to be, fraudulent; and all and every part of the estate thereby intended to be secured to such person' or persons, shall be subject and liable to the payment and satisfaction of the debts due and owing by such person or persons, in as full and ample a manner, to all intents and purposes whatsoever, as if no such deed, contract or settlement, had been ever made or executed.” *
The cases shew that in the interpretation and application of this statute, the inquiry has hitherto been generally confined to the question, whether the instrument under examination fell within the definition of a marriage contract or settlement, and if it came within that description, the instrument has been condemned for want of registration, without making the further enquiry, whether the person raising the objection was entitled to complain: — whether, in fact, he was one of those persons intended by the statute to be protected by the recording which it enjoins. But this is the most material enquiry of all, and first in order. It has recently been decided, unanimously, by a full bench, that however sweeping the terms of this statute, and that of 1823, yet being remedial statutes, they are to be construed according to their spirit and real intent, and that there are persons whose protection did not enter into the purpose of the legislature, and who therefore have no right to complain of a non compliance with their directions. Fowke vs, Woodward, Sp. Eq. 233. If, by a fair interpretation of the Act of 1785, it be found that the mischief intended to be remedied by it was a concealment of the marriage articles or settlement from the creditors of the married parties, and that the remedy was provided for the benefit of these creditors, it must follow that the creditors of Guillemot and wife alone, and not the creditors of Lacoste, can be heard here ; — and can there be a doubt that this is the true interpretation of this Act ? The preamble describes the mischief to be the practice of concealing the instrument by “those interested therein,” to the prejudice of those who maybe induced to trust '•'•such.persons” under the mistaken supposition, *216 that the property in their hands is not settled, but subject to “their” debts, — and it expressly recites that the object of the Legislature is to remedy this mischief and suppress this deceit.
The duty of registering the instrument is plainly imposed on the persons benefited by it, and if this were less clear from the terms of the Act, its title * is sufficient to dispel all doubt upon the subject. Where the contract or the parties are in the State, a shorter time is allowed ; but where either the instrument or the parties are out of the State, a longer time is allowed to “the parties interested therein” to effect the registration. Then the consequences of neglect are pointed out. If the parties ‘■'•interested in such. deed, contract or settlement,” neglect to record it, it shall be deemed fraudulent “in respect to creditorsWhose creditors ? Why, surely the creditors of “the parties interested therein.” — the creditors of “such persons” as by concealing the settlement which they were directed to record, have, induced these creditors, (says the preamble,) to trust them by the delusive exhibition of property in their hands apparently liable to “their” debts. If this can possibly be still doubted, let us read the Act further. What is the precise consequence of the fraud on the creditors 'l Why, simply, that the “estate thereby intended to be secured to such persons,” shall be thrown open, not to the creditors of every body or any body, but to the creditors of the parties interested, and made as liable to the debts due by them as if no such deed had been executed.
I cannot hesitate for a moment, as to the true spirit and proper construction of this Act. The registration required by it, was intended exclusively for the benefit of creditors of, and purchasers from, the persons interested in the contract or settlement ; and none but they can complain of the want of registration.
One or two further objections to this claim of Guillemot and wife remain to be noticed ; but they were so feebly urged that they had nearly escaped me.
One of them is, that no debt is due for the capital of forty thousand francs, which was payable at Lacosfe’s pleasure, but only for the interest as it accrues, which alone should be provided for. But the French lawyers say that the contract constitutes a debt (and even a lien) for the full amount, from the time *217 of the marriage. If this were not so, probably the detention of the interest was sufficient to render the capital demandable instantly. But this matter is put beyond doubt by the subsidiary assignment of January, 1841, in which Lacoste recognises the capital as a debt, and indicates his pleasure by a direction that it be paid.
Another objection is, that by the terms of the contract, a reversionary interest is reserved to Lacoste and his wife, in case their daughter should die in their lifetime without leaving issue. But this is such a contingent interest in Lacoste, as cannot be attached upon at this time for the benefit of his creditors. The debt is due now. Certainly, Lacoste could not excuse himself from the payment of it, on the ground that by a bare possibility a future right may spring up on his part to reclaim the money. When the contingency happens, he may make his claim; and his 'creditors’s rights, being dependent upon his, must obey the same rule.
The next question relates to the validity of Lacoste’s assignment of June, 1840. The Chancellor condemns this instrument, on the ground of intentional fraud; and I am of opinion his conclusion must be supported.
The case is briefly this. The debtor, being possessed of property not only in this State, but elsewhere, by his deed of assignment, purporting to be executed in fulfilment of a design, which it recites, of paying his creditors, rateably, “as far as his property, of whatever hind, will extend,” conveys, as his whole estate, only so much of- his property as lies in South Carslina, taking no notice whatever of the existence of any extra-territorial property. By the terms of the deed, he gives a preference to such creditors as shall, within a limited time, release him from whatever portion of their demands may not be extinguished by the property assigned, and if any balance remains of the assigned assets, after paying off the accepting creditors, it is to be applied to his debts generally. A single creditor, whose demand falls short of the property included in the assignment, has accepted; the rest, whose demands far exceed it, dissent and attach the instrument.
The argument in support of this deed is, that preferences among creditors are allowable, and that the dissenting creditors here, could not, therefore, have complained if they had been entirely excluded, instead of having been allowed the privilege of ranging themselves in the preferred class. That it they have *218 lost that advantage, this was the consequence of their own voluntary neglect; and, after all, their default has only resulted in a case of mere preference — a preference which has worked no injury to them as dissenting creditors, inasmuch as, by the very terms of the deed, all the remaining property covered by the assignment, is still open to them, and all the extra-territorial property is as liable as it would have been if no such deed had ever been executed. The fraud lies in a delusive offer of alternatives to the creditors, some of which they dare not accept, without subjecting themselves to conditions, the consequences of which were carefully concealed from them, (or rather covered by misrepresentation) and which were calculated to secure advantages to the debtor to which he was not entitled.
Will it be denied that every creditor had an interest in this assignment from the moment of its execution ? If not, then. the professions of the instrument were delusive. Will it be denied, that a free choice among the alternatives presented, was, in itself, one of the benefits proposed ? If so, there should have been no lurking danger to attach, if the creditors should make an unwary choice. The scheme of this assignment was such, that the creditors were to be led on to accept, under the expectation and belief that the assignment covered their debtor’s whole estate, and that the releases which were exacted were to be an empty discharge of his future, and merely possible, acquisitions. But if they had accepted and released, they would have found, to their surprise, that they had been tricked into a discharge of property that should'have been accessible to their demands. It is no answer to this to say, that if they had so released, they were entitled to have the releases set aside. For on what ground would they have been thus entitled? On the ground of fraud in obtaining them. And how obtained 1 By the instrumentality of the assignment professing to contain an entire surrender of their debtor’s property, whereas, it embraced but a part of it. What is this but to admit, indirectly, that the deed was, in itself, fraudulent ?
The defence of this deed proceeds upon a misconception of the true grounds of objection to it.
The ground is, not that it gave a preference ; Vaughan vs. Evans, 1 Hill Ch. 414, and innumerable other cases, shew that preferences, fairly given, are allowable.
Nor is it the exaction of a release for any unsatisfied balance ; Niolon vs. Douglas, 2 Hill Ch. 443, a case decided almost *219 unanimously by both benches, and to the entire satisfaction, so far as I know, of the profession, is authority for such an exaction when made under fair circumstances. The difference between the assignment in that case and in this, is immense. That, not only profess to be, but was, a surrender of the debtor’s whole property. ' This is a partial surrender, with a deceitful coloring leading to a belief that the whole was given up. The fraud here, consists in an artful combination of two things, each of which is, in itself, lawful; preferences given as the premium of releases exacted — and in the application of them to a case where the first thing demanded by justice, to wit, a full surrender of the debtor’s property, has not been performed. In Jacot vs. Corbett, Cheves’s Eq. 71, it was held, that a reservation for the debtor’s benefit, was a direct fraud. The effort here, was to obtain the sanction under the hands of creditors to a similar benefit, which benefit was concealed from them by their debtor. The result, if the effort had been successful, would have been the same in the one case as in -the other, — and shall it be said, that the intention to produce a fraudulent result, is not a fraudulent intention ?
A passage in Niolon vs. Douglas,* has been commented on, as giving the substance of the argument in support of Lacoste’s assignment. It is there said, “Johnson’s assignment would not have been invalid, if he had simply preferred his other creditors over the plaintiff. It would have been clearly valid, if he had surrendered to the other creditors without condition. I suppose it would have been equally valid as against the plaintiff, if, in his surrender to them as privileged creditors, he had required releases from them. Such a requisition, so far from being a subject of just complaint with the plaintiff, would have been.greatly to his advantage, by freeing the debtor’s after acquisitions from claims which might otherwise have stood in the way of his obtaining satisfaction of his debt. Then, if it would have been no fraud in the debtor to prefer others over the plaintiff, with or without conditions, is he defrauded by giving him an opportunity to participate with them? an opportunity which it would not have been fraudulent in the debtor to have denied him. If the plaintiff refuses to accept the condition proposed, his refusal only reduces him, by his own voluntary act, to the position of an unpreferred creditor. He is not only left uninjured, but, as I *220 remarked before, he is positively benefitted by the condition, although he has not accepted it; the acceptance of it by others having warded off competing claims from the debtor’s after acquisitions.” I adhere to every word of this passage; but I cannot apply .one word of it to the case of a partial and deceptive surrender.
In Johnson's case, no fraud could have been perpetrated upon creditors, either accepting or dissenting. If they accepted, they got all their debtor was worth, and their release of any. unpaid balance was an empty thing. If they dissented, they did so in the face of their debtor’s honest proposal to do all for them in his power to do, and knowingly took their chances to be paid out of his future acquisitions.
When, therefore, it was asked, “if it would have been no fraud in the debtor to prefer others over the plaintiff, with or without conditions, is he defrauded by giving him an opportunity to participate with them'?” The answer must, evidently, be “ no.” Eut why ? Simply because none of those who took the preference and released, were, or could have been, defrauded. But here, every creditor who might accept beyond the amount of the assigned assets, in which case only would the required release have been of any import, would have been defrauded; and it was a delusion and a mockery to hold out, under specious appearances, an opportunity and a temptation to the dissenting creditors to share in such consequences.
The matter appears very plain to my mind, and I have, I fear, labored it too much, with the hope of making it as plain to others.
Two circumstances have been selected to secure this transaction from the imputation of bad faith. It is said that Lacoste, had his desighs been unfair, might have confessed a judgment to his daughter and son-in-law, and his abstaining from this is evidence of good intentions towards all his creditors. He put them all on one footing. This argument assumes that the motive of the fraud was parental and not selfish. But the reservation of property, to be secured by the releases exacted, was in his own right and not in right of his daughter, and it was himself alone who was to be benefitted. Was this less a fraud, because, in its scope, it extended to all his creditors — his daughter as well as the rest?
• Another circumstance relied on, is the execution of the assignment of January, 1841, after the limited time for accepting the *221 former had expired. It is said, he could not have known, at the time this second assignment was executed, that every creditor had not already accepted under his previous assignment, and that the second assignment is proof of a sincere desire to do justice to all his creditors. Let this go for evidence of a returning sense of justice, which is all that it can prove, how does it serve to undo the wrong already inflicted ? The dissenting creditors had already been deprived of the equality of benefits professedly held out to them, by the acceptance of one creditor, while they were compelled to abstain, and the limited time within which they might have accepted had expired; and how were they to reinstate themselves ‘l
The last question to be decided is, upon what conditions is this court to interpose for setting aside the fraudulent assignment, and giving the creditors the benefit of the assets ?
The assignment displaced no liens. All the judgments have been obtained, not only since the date of the deed, but since the sale of the assigned property by the assignees. . There is no doubt, then, that all the creditors must stand upon an equality, and be satisfied pro rata.
Upon all the questions, therefore, this court concurs in the result of the Chancellor’s decree, and it is ordered that the same be affirmed and the appeal dismissed.
Butler, Evans, Wardlaw and Frost, JJ. concurred.
Dunkin, Ch. concurred in the result.

 “ An Act to oblige persons interested in marriage deeds or contracts to record the same in the Secretary’s office of this State.”

 2 Hill Ch. 451.