## HARRISON v. STERRY AND OTHERS.

THIS was an appeal from a decree of the circuit court for the district of South Carolina, in a suit in equity, in which *Richard Harrison* was *complainant*, and the following parties defendants, viz. 1. The *United States*. 2. *Sterry* and others, assignees of *H. M. Bird* and *Benjamin Savage* under a British commission of bankruptcy. 3. *Aspinwall* and others, assignees of *Robert Bird*, under an American commission of bankruptcy. 4. Several *American creditors* who had attached the effects of *Bird, Savage & Bird*, in South Carolina. 5. Several *British creditors* who had also attached the same effects. And, 6. *Thomas Parker*, who, by consent of the creditors, had been appointed by the court of common pleas in South Carolina, an agent for all the parties concerned, to collect and receive the debts due to *Bird, Savage & Bird*, which had been attached, and when

<em>In the distribution of a bankrupt's effects in this country, the United States are entitled to a preference, altho' the debt was contracted by a foreigner in a foreign country; and although the United States had proved their debt under the commission of bankruptcy, and had voted for an assignee. An assignment by one partner, or the name of the</em>

HARRISON
v.
STERRY.

received, to hold the same till the further order of the court.

copartnership, of the partnership effects and credits, is valid. Under a separate commission of bankruptcy against one partner, only his interest in the joint effects passes. The bankrupt law of a foreign country cannot operate a legal transfer of property in this country.

The question was, how those attached effects should be distributed.

*Harrison*, the complainant, claimed them as a trustee for the benefit of certain creditors of the house of *Robert Bird & Co.* which was the name of the firm by which the house of Bird, Savage & Bird of London, carried on merchandise at New-York. Robert Bird, desirous of aiding and supporting the credit of the house of Bird, Savage & Bird, by raising funds, upon the security of the cargo of the East-India ship *Semiramis*, and certain debts to a large amount due to them in South Carolina, made a deed of trust on the 3d of December, 1802, intending thereby to assign that cargo and those debts to the complainant. The deed purported to be signed and sealed by *H. M. Bird* and *Benjamin Savage*, by *Robert Bird*, their attorney; and by *Robert Bird*, in his own right. It recited that, " whereas H. M. Bird, Benjamin Savage and Robert Bird, being copartners in trade under the several firms of Bird, Savage & Bird, and Robert Bird & Co. have in consequence of disappointments been obliged to borrow money from the bank of England, and under the firm of Robert Bird & Co. to purchase bills of exchange, public and bank stocks and goods, upon credit in America, in order to furnish means of more effectually supporting the credit of the said Bird, Savage & Bird of London. And whereas it may be necessary for the purpose aforesaid, that the said Robert Bird & Co. should continue to make such purchases until the present difficulties may be removed; and security having been already given to the persons bound as sureties to the bank of England, for their responsibilities, the said H. M. Bird, Benjamin Savage and Robert Bird, are desirous to secure all persons from whom purchases have been or may be made as aforesaid, for the purpose of aiding the said house or firm of Bird, Savage & Bird. Now, therefore, know ye, that the said Henry M. Bird, Benjamin

·Savage and Robert Bird, for the purpose above expressed," &c. The trust expressed was " to apply the same and every part thereof for the equal security and indemnification, in proportion to their just demands, of all persons from whom the said Robert Bird & Co. shall, before the end of the year 1803, have made any such purchases of goods, stocks or bills, or who before that time shall be holders of any bills of exchange drawn or negotiated by the said Robert Bird & Co. for the purpose of giving support to the house of Bird, Savage & Bird, as aforesaid."

Another ground of Harrison's claim was a similar instrument of writing, dated the 31st of January, 1803, not under seal, but signed, " *Bird, Savage & Bird*," and " *Robert Bird & Co.*" which signatures were in the hand-writing of *Robert Bird.*

The bill of complaint stated that Robert Bird & Co. before and after the 3d of December, 1802, and before the end of the year 1803, made various purchases of stocks, goods and bills of exchange, and became indebted for bills drawn and negotiated by them for the purpose of giving support to the house of Bird, Savage & Bird, which debts remain unpaid. There was a letter of attorney from Henry M. Bird and Benjamin Savage, to Robert Bird, but it did not authorize him to *execute deeds* in their names generally.

The claim of the United States rested upon the priority given by the act of congress of the *3d of March*, 1797. *Vol. 3. p.* 423. § 5.

The *attaching* creditors relied upon their attachments under the laws of South Carolina.

The assignees under the several commissions of bankruptcy relied upon the British and American bankrupt laws.

The United States had proved their claim under the American commission, and had voted in the

HARRISON
v.
STERRY.

HARRISON
v.
STERRY.

choice of assignees. They had also attached the effects in South Carolina, under the laws of that state, and had arrested Robert Bird, and held him to bail in New-York.

The court below decided that the United States were entitled to priority of payment. That after satisfaction of that claim Harrison would be entitled, under the assignment, to Robert Bird's third part or share of the property mentioned in the deed, and the attaching creditors to the other two thirds. That the assignees under the British commission could take nothing; and that the assignees under the American commission could take nothing but the surplus after all the other classes of creditors were satisfied.

From this decree all the parties, excepting the United States, appealed.

*C. Lee, in behalf of the attaching creditors,* admitted the priority of the United States, but contended that his clients were entitled to the whole of the surplus after satisfaction to the United States. They have a *legal* priority by means of their attachments, and they have equal equity. The statutes of South Carolina gives them as good a title at law as if goods were taken under a *fieri facias.*

Robert Bird's letter of attorney did not authorize him to make deeds of conveyance or assignment in the names of his partners; nor did his power as one of the firm extend to sealing deeds in their names, nor to assigning the partnership effects without seal. But a more solid objection to Harrison's deed is, that it was made to cover the property from the other creditors; and was made in contemplation of bankruptcy It was not to pay a debt to Harrison, but to support the credit of Bird, Savage & Bird. It does not name the creditors, nor mention any sum which it was intended to secure. It could not convey more than an equitable title to Harrison in the *choses in action,* but the creditors who attached

4

gained *the legal title*, without notice of Harrison's claim. Equity will not deprive them of this legal title. *2 Eq. Cas. Abr.* 85. Nor will equity protect an assignment of a *chose in action* except for a precedent debt.

HARRISON
v.
STERRY.

The assignees under the British commission must yield to the attaching creditors. If they have any right, it can only be from the date of the assignment, which was subsequent to the attachments. *Doug.* 170. *Le Chevalier* v. *Lynch*. 2 *H. Bla.* *Hunter* v. *Potts.* 1 *H. Bla.* 665. *Sill* v. *Worswick.* 1 *East*, 6. *Smith* v. *Buchannan.*

This case differs from that of the *United States* v. *Hooe*, 3 *Cranch*, 73. That was an assignment of real estate ; this is only of a *chose in action.*

It does not appear when the acts of bankruptcy were committed. The commission against Bird & Savage issued on the 12th of June, 1803; that against Robert Bird on the 5th of December, 1803, and as the act of bankruptcy must be within six months before issuing the commission, it must have been subsequent to the 5th of June, 1803, long subsequent to the attachments.

There is no distinction between the rights of the British and the American attaching creditors. They all come in according to the dates of their attachments.

MARSHALL, Ch. J. Does the law of South Carolina create a *lien* from the time of the attachment without power to release the attached effects?

*Harper, for the assignees under the British and American commissions.*

The attachment may be dissolved by bail; but if no bail is given, and judgment of condemnation be had, it relates back to the time of the attachment, in the same manner as a *fieri facias* lodged in the

HARRISON
v.
STERRY.

hands of the sheriff, under the statute of frauds. *Laws of South Carolina*, p. 188. § 3. and 8. But the 31st section of the bankrupt law of the United States, *vol.* 5. *p.* 67. destroys all liens created by prior attachments. We admit that the bankrupt laws of England have no such effect in this country.

The case of the *United States* v. *Fisher* establishes the right of the United States to priority of payment. But the United States may waive their right by coming in as a creditor under the bankrupt law. They stand on the same ground with the attaching creditor at *St. Kitts* in the case from *Douglass*. If he had afterwards proved under the commission, it would have been a waiver of his priority under his attachment. So if a mortgage creditor would prove under the commission, he must relinquish his mortgage.

The United States have proved their debt under the commission, and voted in the choice of assignees. If in such a case an individual would be excluded, so will the United States, unless they can show that the agent had no authority. It is stated to have been done by the attorney of the United States for the district, who is the proper officer to prosecute for, and recover the debts due to, the United States, in the manner most for the interest of the United States, according to the best of his judgment. The United States are bound even by his mistakes.

The United States have elected to prove under the commission, and are bound by that election.

The commissioners of bankrupt cannot distribute but as the bankrupt law directs. They cannot pay the United States more than their dividend *pro rata*.

The debt from Bird, Savage & Bird was contracted in England, where they were bankers for the United States. Can the United States claim a preference against British subjects resident in England? Can they claim it in this country, under the commission here against British subjects?

As to the claim of *Harrison*. The instrument of January 31, 1803, is not sufficient to transfer even the property of Robert Bird. It could not assign the joint effects, because that was an act which he had no right to do. He had no right to use the name of the firm for that purpose. It does not transfer his own *indiv dual* right, because it purports to transfer the *joint* estate in the *joint* name.

It is an act attempted to be done by the firm. One member of a firm may sell the goods and give a good receipt, because they are acts necessary in the regular course of business. But how far does this power extend? We must look, for an answer, into the law of merchants. It extends to the drawing and accepting bills, making notes, bills of parcels, receipts, bargain and sale of chattels in the course of the trade; but not to the assignment of the property of the firm for the purpose of obtaining more credits, because this is not necessary in the usual course of their business. It is an extraordinary act in which all the members concur. It is a case not foreseen, nor contemplated, and therefore not provided for, by the law merchant.

In England a copartner cannot bind the firm by a bond: not because there is any magic in a seal, but because it is not necessary in the regular course of business. So with regard to real estate; one partner alone cannot convey. A secret assignment of property is not a regular mercantile transaction; and if one partner were permitted to make it, it might be the instrument of deception, if not of legal fraud.

But such an assignment is void by the bankrupt law. It is a conveyance, on the eve of bankruptcy, to give a preference to a particular class of creditors. It does not appear by the record that this assignment to Harrison was not of the whole estate of the bankrupts, at least the whole in this country.

It cannot operate as the deed of Robert Bird,

because not executed in his own name, and as his deed. It cannot convey the joint interest of Bird, Savage & Bird, because, not executed in the name of the firm. And if it could, it is void under the bankrupt law.

As to the attaching creditors; the attachment, under the laws of South Carolina, did not change the property. It only gave a specific lien; but if it did change the property, still it is overruled by the express words of the 31st section of the bankrupt law.

The British creditors cannot give a priority by attachment in this country. They must come in under the British commission of bankruptcy; for they as well as the bankrupts were subject to the British bankrupt laws. They were bound by the assignment in England, and must claim under it, if they can claim at all.

*P. B. Key*, for *Harrison*.

The assignment to Harrison is legal and valid. It was at least competent to convey Robert Bird's interest.

The instrument of January 31, 1803, was not an act of bankruptcy in itself. It was more than six months prior to the issuing of the commission. It was a disposition of the property for a valuable consideration, not in payment of antecedent debts, but to raise new funds for the benefit of all the other creditors. This was not an unjust preference. It was equivalent to an absolute sale. Robert Bird had the full control over the debts due to the firm in this country. He could release, or assign and transfer, or sell, and, *à fortiori*, he could mortgage or pledge them. These creditors have peculiar merit. They advanced funds upon the credit of this property. The other creditors did not. The funds raised upon this property have been applied for the benefit of the general estate which has suffered no diminution by this exchange of property.

If the other creditors succeed in destroying this assignment to Harrison, they will have a double share, while these creditors will get nothing.

HARRISON<br>v.<br>STERRY.

The priority claimed by the United States did not attach until the bankruptcy. The commission issued on the 5th of December, and the act of bankruptcy upon which it issued must have been committed within six months, next preceding, viz. after the 5th of June. But this assignment was long antecedent to that day. That the priority takes place when the event of insolvency happens, is to be inferred from the opinion of this court in the case of *The United States* v. *Fisher*, 2 *Cranch*, 385. 395.

*Rodney, Attorney-General, for the United States.*

The assignment to Harrison was made in contemplation of bankruptcy, and therefore void. It was made on the 31st of January, and on the 6th of February the commission issued in London. The situation of the house must be presumed to be known to all the partners. *Peake's Cas.* 200. *Burr.* 830. It was not made to secure previous debts; no sum is mentioned; the debts were unascertained. The possession was not delivered, nor even an assignment of the bill of lading.

If it was made to defeat the bankrupt law, or even to secure a creditor, it is void. *Burr.* 467. 474. *Cowp.* 117. 122. It is not necessary that it should have been of all the estate. An assignment even of one third is fraudulent. *Cowp.* 632. 3 *Wils.* 47, 4 *Burr.* 2239.

The assignees under a separate commission cannot recover the joint effects in their own name, but they may use the joint name. 1 *Johns.* 123. An assignment under a joint commission transfers the joint and *separate* property. 2 *P. Wms.* 500. *Cox's* note, *ex parte Cooke*.

*Harper.* A joint commission may issue if all the partners be within the jurisdiction; but on a separate commission, nothing of the joint funds passes but the right of the bankrupt in them. *Cowp.* 445. 449. 7 *Bac. Abr.* tit. *Merchant.* 12 *Mod.* 446. 1 *Ves.* 242.

*March* 15.

MARSHALL, Ch. J. delivered the opinion of the court as follows, viz.

The object of this suit is to obtain the direction of the court, for the distribution of certain funds in South Carolina, which were the property of a company trading, in England, under the firm of Bird, Savage & Bird, and in America, under the firm of Robert Bird & Co. The United States claim a preference to all other creditors, and their claim will be first considered.

Two points have been suggested, as taking this case out of the operation of the preceding decisions of the court respecting the priority to which the United States are entitled.

1. That the contract was made with foreigners, in a foreign country.

2. That the United States have waived their privilege, by proving their debt under the commission of bankruptcy.

1. The words of the act, which entitle the United States to a preference, do not restrain that privilege to contracts made within the United States, or with American citizens. To authorize this court to impose that limitation on them, there must be some principle in the nature of the case which requires it. The court can discern no such principle. The law of the place where a contract is made is, generally speaking, the law of the contract; i. e. it is the law by which the contract is expounded. But the right of priority forms no part of the contract

itself. It is extrinsic, and is rather a personal privilege dependent on the law of the place where the property lies, and where the court sits which is to decide the cause. In the familiar case of the administration of the estate of a deceased person, the assets are always distributed according to the dignity of the debt, as regulated by the law of the country where the representative of the deceased acts, and from which he derives his powers; not by the law of the country where the contract was made. In this country, and in its courts, in a contest respecting property lying in this country, the United States are not deprived of that priority which the laws give them, by the circumstance that the contract was made in a foreign country, with a person resident abroad.

2. Nor is this priority waived by proving the debt before the commissioners of the bankrupt.

The 62d section of the bankrupt act expressly declares, that " nothing contained in that law shall, in any manner, affect the right of preference to prior satisfaction of debts due to the United States, as secured by any law heretofore passed."

There is nothing in the act which restrains the United States from proving their debt under the commission, and the 62d section controls, so far as respects the United States, the operation of those clauses in the law which direct the assignees to distribute the funds of the bankrupt equally among all those creditors who prove their debts under the commission. Omit this section, and the argument of the counsel for the general creditors would be perfectly correct. The coming in as a creditor under the commission might then be considered as electing to be classed with other creditors. But the operation of this saving clause is not confined to cases in which the United States decline to prove their debt under the commission. It is universal. It introduces, then, an exception from the general rule laid down in the 29th and 30th sections of the

act, and leaves to the United States that right, to full satisfaction of their debts to the exclusion of other creditors, to which they would be entitled, had they not proved their debt, under the commission.

The priority of the United States is to be maintained in this case, unless some of the creditors can show a title to the property anterior to the time when this priority attaches.

The assignment made to Richard Harrison is, it is contended, such a title.

To this assignment several objections have been made.

1. It is said that Robert Bird was not authorized to make it, because it is not a transaction within the usual course of trade. But this court is of opinion that it is such a transaction. The whole commercial business of the company in the United States was necessarily committed to Robert Bird, the only partner residing in this country. He had the command of their funds in America, and could collect or transfer the debts due to them. The assignment under consideration is an act of this character, and is within the power usually exercised by a managing partner. In such a transaction he had a right to sign the name of both firms, and his act is the act of all the partners.

2. It is the assignment of a *chose in action;* and is, therefore, to be considered rather as a contract than an actual transfer, and could be of no validity against the several claimants in this case.

The authorities cited at bar, especially those from 1 *Atk.* and *Williams's Law Cases,* are conclusive on this point, to prove that equity will support an equitable assignment.

3. But a third exception has been taken to this instrument, which the court deems a substantial one.

It is made under circumstances which expose it to the charge of being a fraud on the bankrupt laws.

Considered as the act of Bird, Savage & Bird, it is dated but a few days before their bankruptcy; and considered as the act of Robert Bird & Co. it is but a short time before they stopped payment, and is made at a time when there is much reason to believe, from the face of the deed, as well as from extrinsic circumstances, that such an event was in contemplation.

Money actually advanced upon the credit of this assignment, subsequent to its date, might perhaps be secured by it; but there is no evidence that any money was actually advanced upon it, and the face of the instrument itself would not encourage such an opinion. It might be caught at by those who were already creditors, but holds forth no inducements to become creditors. It was impossible for any person viewing it to judge of the sufficiency of the fund, or of the pre-existing liens on it.

This assignment, therefore, under all its circumstances, many of which are not here recited, is no bar to the claim of the United States, or of the attaching creditors.

This being the case, there exists no obstacle to the priority claimed by the United States, and their debt is to be first satisfied out of the fund to be distributed by the court.

2. The attaching creditors are next in order.

By the bankrupt law of the United States, their priority, as to the funds of the bankrupt, is lost. They can only claim a dividend with other creditors. So far, then, as the effects attached are the effects of the bankrupt, their lien is removed by the bankruptcy.

Robert Bird alone has become a bankrupt under

the laws of the United States. Consequently, only his private property and his interest in the funds of the company pass to his assignees. This interest is subject to the claim of his copartners, and if, upon a settlement of accounts, Robert Bird should appear to be the creditor or the debtor of the company, his interest would be proportionably enlarged or diminished. But he is not alleged to be either a creditor or a debtor; and of consequence, the court consider his interest as being one undivided third of the fund. This third goes to his assignees.

As the bankrupt law of a foreign country is incapable of operating a legal transfer of property in the United States, the remaining two thirds of the fund are liable to the attaching creditors, according to the legal preference obtained by their attachments.

The court thinks it equitable to order that those creditors who claim under the deed of the 31st of January, 1803, and who have not proved their debts under the commission of bankruptcy, should be now admitted to the same dividend out of the estate of the bankrupt as they would have received if, instead of relying on the deed, they had proved their debts. The assignees, therefore, take this fund subject to that equitable claim, and in making the dividend, those creditors are to receive, in the first instance, so much as will place them on an equal footing with the creditors who have proved their debts under the commission.

With respect to any surplus which may remain of the two thirds, after satisfying the United States, and the attaching creditors, it ought to be divided equally among all the creditors, so as to place them on an equal footing with each other. The dividends paid by the British assignees, and those made by the American assignees, being taken into consideration, this residuum is to be so divided between them as to produce equality between the respective creditors.