CASE 51—PETITION EQUITY—MARCH 24.

# Lehmer, &c., vs. Herr, &c.

APPEAL FROM LOUISVILLE CHANCERY COURT.

1. Whether the local law of Kentucky, in relation to assignments made " in contemplation of insolvency," applies to the case of an assignment preferring certain creditors, made in Maryland, so as to make the assignment fraudulent as to property of the assignor attached in Kentucky, is a question not concluded by the authorities. (5 *Cranch*, 289; 12 *Wheat.*, 359; 13 *Mass.*, 146; 2 *Kent's Com.*, 406; *Story's Com. Laws*, sec. 416.)

2. See the opinion for the facts showing that the assignment was actually fraudulent.

W. F. BARRET, J. SPEED, and BULLITT & SMITH, for appellants, cited *Civil Code*, secs. 155, 257, 153; 1 *Stat. Law*, 301; 9 *B. M.*, 189.

T. A. MARSHALL for appellees.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

On the 2d day of April, 1857, Michael Herr, of Baltimore, engaged for several years in an extensive distillery and pork-house in Wheeling, and in the purchase of grain and hogs at his domiciliary establishment and elsewhere, contemplating financial embarrassment, conveyed to L. T. Barry, also of Bal-

timore, all his estate, real and personal, in possession and in action, in trust for the payment of his debts. The deed, without specifying any of the debts or naming any of the creditors, except the first class, to whom it gave preference over all others, embraced in that class, consisting of seventeen persons, twelve who were his brothers and sisters, and kindred in a remoter degree.

About the date of that assignment, an agent of the assignor bought for him a large quantity of corn, which, on the 4th of April, 1857, was delivered on two steamboats for transportation to the superintendent at Wheeling.

On the 6th of April, 1857, while these boats were *in transitu*, the appellants, produce dealers in Cincinnati, attached the corn for a debt of about $30,000 for grain, &c., which they had sold to the said Herr on credit. Barry intervened, set up the deed of trust, and asserted title to the corn under that conveyance. The appellants amended their petition and charged that the conveyance was fraudulent and void as to them, who were not named in it, but were superseded by the preferred class. The appellee having traversed the charge of fraud, the chancellor, on the final hearing, discharged the attachment and dismissed the petition.

Although several minor questions are involved in the record, yet, as the question of fraud, independently of all others, may be so solved as to dispense with any other decision, we will confine our attention to that controlling question alone. And this question is two-fold—1st. Does the local law of Kentucky, in relation to assignments made "in contemplation of insolvency," apply at all to this case so as to make the deed constructively fraudulent, so far as the attached corn is concerned? And, 2d. Although assignments preferring creditors are not, therefore, *per se* fraudulent in Maryland, yet is not the deed of trust, even according to the common law, which was the *lex loci contractus*, fraudulent in fact?

I. According to the international rule of comity, *the lex domicilii* will generally prevail as to contracts respecting movable property, which, being for most purposes potentially with the person of the owner, is generally treated as actually being at

his domicil and governed by its law. But the principle and policy of comity make some exceptions from this general rule. And the supreme court of the United States has decided that an assignment, *in invitum*, under the bankrupt law of one State, though it may be binding on the bankrupt everywhere, operates *in rem*, and, therefore, intra-territorially only as to the bankrupt's property in another State, attached by a citizen of any other State. (*Harrison vs. Sterry*, 5 *Cranch*, 289 ; *Ogden vs. Sanders*, 12 *Wheat.*, 359.)

This may be deemed the American, though inconsistent with the British doctrine. But a voluntary assignment of movables, being generally ubiquitous in its legal operation, does not necessarily come within the same category. And, respecting such assignments, there is a vexatious diversity in American dicta and decisions. In *Ingram vs. Guyer* (13 *Mass. R.*, 146), the supreme court of Massachusetts decided that a voluntary assignment of all the assignor's property for the benefit of his creditors generally, though valid in Pennsylvania, where made, should not prevail against a subsequent attachment in Massachusetts, where such assignments are deemed fraudulent and prejudicial to the creditors in that State. And this decision seems to have been corroborated by the concurrent decisions of some other State courts, and finally approved by *Chancellor Kent*, in the 35th section of his Commentaries, 2d volume, 2d edition, pages 406–8 ; and also by *Justice Story*, in 416th section of his Conflict of Laws.

Then, if this be the true American doctrine, as Herr's assignment would have been constructively fraudulent if made in Kentucky, it might have been properly so held in this case. But, as this question is not concluded by authority, and may be superseded by our opinion on the broader and surer ground of actual fraud, we shall forbear to venture any utterance as to the preponderance, either way, of principle, policy, or authority on the unsettled doctrine.

II. The following badges of collusion constrain us to the conclusion that Herr's assignment was tainted with actual fraud to the prejudice of the appellants and other postponed creditors :

1. About the time of the assignment Herr estimated his estate at $400,000, and the record contains neither allegation, nor even intimation, that his indebtedness was near equal to his means, or, in any way, such as to make such an indiscriminate and sweeping assignment either necessary or prudent for the security of the preferred creditors, or just to those whom he postponed.

2. As before suggested, most of the persons preferred were the assignor's brothers and sisters, and other relations; and, although his own deposition was taken by the appellee, there is no intimation in the record of the aggregate of their debts, or of the amounts of their individual claims, or of the amount of the debt due to any other creditor, or of the character of the debts to his preferred kindred, except that it was for loans of "*long standing*," without any written evidence of any such loan.

3. Preparatory to the assignment, the assignor, within less than a month before its date, had conveyed to his same brothers and sisters and other preferred kinsfolk, large tracts of land in Illinois and elsewhere, for high ostensible considerations ($44,000 in one deed) advanced by each of them; and there is neither proof nor suggestion that he owed each of them that much, or that, afterwards, anything remained due to them, or any of them; nor why, in a few days, his whole estate, without specification or discrimination, was assigned to them, principally, as preferred creditors.

4. On the 16th of December, 1856, an absolute conveyance was secretly made by Herr to one of his brothers of his porkhouse and distillery at Wheeling, for the ostensible consideration of $50,000, and confidentially deposited with one of his clerks at Wheeling, with instructions to hold it until directed otherwise to dispose of it. It was thus secretly kept until the day of the assignment, when the clerk was telegraphed to record it. Still, until after the assignment, the pork-house and distillery were carried on in the name and for the benefit of Michael Herr, at whose expense they were, in the meantime, so improved as to increase their value from $60,000 to $100,-000. And, nevertheless, when, shortly after the date of the

assignment, the appellee, as trustee, took posssession of the grain, hogs, and other personalty subservient to the working of the pork-house and distillery, he sold to that same brother the whole of those movables by private contract without valuation and at a sacrifice ; and the clerk, remonstrating against it, was told to say nothing about it. And, after all, Michael Herr, in his deposition, testifies that the conveyance of the distillery to his brother was, in fact, intended only as a collateral security for $33,000, which may be presumed to have been all he owed him, if, indeed, he owed him anything, and over $6,000 of that sum was paid in March, 1857, by the conveyance of a particular tract of land ; and about the 15th of April, 1857, with the knowledge and consent of the appellee, as trustee, he took possession of the pork-house and distillery as his own, and appointed Michael Herr his manager to carry them on for him, and as his property. And still that same brother, as we infer, not only is permitted to hold that property with its intermediate improvements made by Michael Herr, estimated as worth $100,000, and also the land in Illinois, but is made by the assignment a preferred creditor, on an arbitrary sliding scale, for an indefinite amount of pretended debt.

5. Herr's books in Baltimore, the center of his business, would, if honestly kept, show the amount of his entire indebtedness, the names of all his creditors, all payments made to them, and the balance due to each of them. But they have been artfully and persistently withheld from inspection. The clerk who kept them testified that the appellee, as trustee, forbid him to give any extract from them or to permit the appellants or any other creditor to see them, and had, to assure their occlusion, given him a bond to indemnify him for all the consequences of his obedience to the wrongful and significant injunction.

6. Barry, the trustee, is also, by affinity, a relation of the assignor Herr ; and, though he is one of the preferred creditors, does not state that he is a *bona fide* creditor, nor show by any satisfactory evidence *aliunde* that he is a creditor at all, or for what or how much. And the deed allows him full discretion and liberal pay for its exercise.

7. Smith, another relation and preferred creditor, holds a legal title to land conveyed to him by Michael Herr in March, 1857, for the recited consideration of a fraction over $14,000 ; and Herr himself shows that this conveyance was made for securing a debt only a fraction over $6,000.

8. On the day of the assignment Herr retained about $700 in money, and had himself also charged with $600 which one Zane owed him for loaned money—telling the clerk, who made, at his instance, the false entry of credit to Zane, that he (Herr) would collect the money from him—and in this way he smuggled about $1,300 from his creditors.

9. Even after the conveyances of large tracts of land to his kindred, and down to the day of the assignment, Michael Herr continued to draw from the appellants, on a false and fraudulent credit, large supplies of grain, &c., contemplating, and by elaborate contrivances, endeavoring all the time to make, such a disposition of a vast estate as to deprive them of the means of reimbursement.

Other symptoms of fraud might be noticed ; but the foregoing badges are deemed altogether sufficient. He who attempts a fraud will try to disguise it; and the fraudulent intent can only be proved by presumptions from a combination of circumstances often minute and separately slight. Here the purpose to defraud creditors is transparent through the unbefiting drapery designed to conceal it and to clothe the entire transaction with the false semblance of an honorable self-sacrifice for the benefit of a few favored creditors.

It seems to us that the only rational and consistent interpretation of all the characteristic facts, is, that the peculiar *modus operandi* was contrived for the purpose of securing to the debtor a vast real estate by colorable sales and conveyances to kindred friends who agreed to hold or were expected to hold to the ultimate use of a pretended vendor ; and, after the abstraction of that large fund from his real creditors, to secure the residual property to the same kindred, and five other confidential clerks and friends, either for his own or their use; whereby his tangible estate, large as it was, would be secured against all except the creditors preferred in the assignment of only what remained after the deeds to his brothers, sisters, &c.

. It seems to us that, if this transaction should elude judicial condemnation as collusive, a case will scarcely ever be found in which such a judgment can be expected.

We feel impelled to the conclusion that the assignment litigated in this case was fraudulent as to the appellants, and that they therefore have a right to avoid it so far as the attached corn is concerned. They are consequently entitled to the proceeds of the decretal sale of the corn, after deducting the amount which may have been adjudged to Logston for an unpaid balance of the price for which he sold it to Herr, and also of whatever shall be adjudged to the steamboats for freight. How much, or whether anything should be decreed for freight, we cannot decide, as that question is not judicially presented by the appeal.

Wherefore, the decree discharging the attachment and dismissing the petition is reversed, and the cause remanded for such further proceedings and decree as may be proper consistently with the foregoing opinion.