### McLURE v. MELTON.

1. A question not raised before the referee nor in the Circuit Court cannot properly be brought before this court for consideration.
2. *Piester* v. *Piester*, 22 *S. C.*, 139, affirmed, and held not to have effected any change in the law, impaired the obligation of any contract, nor divested any rights vested by the decision in *Edwards* v. *Sanders*, 6 *S. C.*, 316, which was simply an erroneous declaration of what was the law.
3. This case distinguished from *Herndon* v. *Moore*, 18 *S. C.*, 339, and the extent of that decision stated.
4. That a contract valid under the law as expounded at its date cannot be impaired by subsequent judicial decision, is a doctrine confined to cases of contract, and probably not even then, where it depended upon a single case, never recognized nor followed, and overruled at the first opportunity.
5. The decision in *Piester* v. *Piester* does not affect the validity of any contracts; it only declares the proper construction of a statute prescribing the order in which the debts of a decedent are to be paid. The right of priority forms no part of the contract itself.
6. If it be conceded that that case did change the law, still there is nothing in the constitution to prevent a change in the law of priority of payment out of the assets of one deceased, which is a mere direction to the administrator as to the manner in which he shall administer the assets— a matter at all times subject to legislative control.

Before WALLACE, J., Chester, March, 1885.

The opinion states the case. The appeal was from the following Circuit decree:

The act of 1879 (5 *Stat.*, 111) has been much discussed by our courts, in so far as it relates to the order of payment of the debts of a decedent. The case of *Tunno* v. *Happoldt* (2 *McCord*, 188), followed by the case of *Kinard* v. *Young* (2 *Rich. Eq.*, 258), in construing the language of that act, decides that a mortgage is a preferred claim only so far as it is a lien upon specific property, and when that lien is exhausted, the debt secured by it took rank according to the nature of the instrument by which it was evidenced. As thus declared the law stood until October 14, 1875, when the case of *Edwards* v. *Sanders* (6 *S. C.*, 316) was filed, which announced a different rule as derived from the act of

1789, which had at that time been incorporated in the revised statutes of 1872. By this latter case it was held that after the specific lien of a judgment had been exhausted by foreclosure and sale, the mortgage still took rank amongst judgments and executions as a mortgage, and this without any reference to the nature of the instrument by which the debt was evidenced.

While this case stood as the declared rule of construction of the statute, the referee held that the mortgages set up in this case were preferred claims as such. Before this case came on to be heard upon the exceptions to the referee's report, the case of *Piester* v. *Piester*, 22 *S. C.*, 139, was filed, which reverses the rule as laid down in *Edwards* v. *Sanders* and reëstablishes the rule as declared in *Tunno* v. *Happoldt* and *Kinard* v. *Young*, *supra*. Of course, the mortgages in this case, then, are not preferred claims, as such, unless there is some reason why they are not under the operation of *Piester* v. *Piester*. Counsel accordingly argue that the mortgages here are not under the operation of this latter case, but are to be governed by the rule as stated in the case of *Edwards* v. *Sanders*, because that was the declared rule, by the court of last resort, while their mortgages were in existence, and rely upon the case of *Herndon* v. *Moore*, and the cases there cited, to support this position. 18 S. C., 339.

As is well known to the profession, the Supreme Court of this State, in the case of *Davenport* v. *Caldwell* (10 *S. C.*, 317), decided that the Probate Court had no jurisdiction in matters of partition of real property of deceased persons, and that the act of the general assembly of 1868 providing for the exercise of such jurisdiction by that court was unconstitutional. The Court of Probate, provided for in the constitution of 1868, was organized by act of the general assembly of the same year, and immediately proceeded to exercise jurisdiction in the partition of real estates in pursuance of the power provided for in the organizing act. The trial judge, Hudson, J., in his opinion in the case of *Herndon* v. *Moore*, *supra*, says: "No question was made as to the constitutionality of the act. The profession at large and the Probate Courts and the Circuit Courts and the Supreme Court, all recognized and acted upon a conceded jurisdiction to Courts of Probate in matters of partition. Under this con-

ceded and recognized jurisdiction from 1868 to 1878, thousands of acres of land have been sold in all parts of the State, a vast amount of money invested, conveyances and reconveyances made, titles and rights vested, and innocent purchasers, acting under this common error, shared by legislatures, lawyers, and courts, have become involved." These facts are held by Hudson, J., sufficient to sustain the validity of sales, or at least to render them unimpeachable, made under partition proceedings in the Probate Court in the exercise of a jurisdiction provided for in an act of general assembly decided to be unconstitutional—the ground of the opinion of Hudson, J., being that "a common error makes law."

The Supreme Court sustains the Circuit Judge in this view, and rests the affirming opinion mainly upon the remark of Lord Ellenborough in the case of *Isherwood* v. *Oldknow*, 3 *M. & S.*, 396 (55 Geo. III.), who says : "It has sometimes been said *communis error facit jus*, but I say *communis opinio* is evidence of what the law is, not where it is an opinion merely, speculative and theoretical, floating in the minds of persons, but where it has been made the ground work and substratum of practice." The Supreme Court held in *Herndon* v. *Moore, supra*, that the facts show that an opinion favorable to the jurisdiction of the Probate Court was the "ground work and substratum of practice" for many years, and therefore sustain the validity of the proceedings. With a view to a clear apprehension of the rule, it may be stated thus : where under a *prevailing* and *common* mistake as to the rule of law contracts are made by which rights are acquired and obligations incurred, which would not have been made but for the existence of the common error, such contracts will be upheld. and rights and liabilities under them enforced because the law will not allow itself to be made an instrument of fraud and injustice.

Now, in the case at bar the mortgage of Hopkins, Dwight & Co. was executed at a time when it had been declared by the court of last resort, that mortgages were preferred claims against the general assets even after its specific lien had been exhausted. But it does not appear that the contract had been made and the mortgage executed under a common belief in the soundness of the rule declared to be the law at that time, or that the rule so

declared had been "the ground-work and substratum of practice," or that the practice of taking mortgages would not have been the same if the rule as stated in *Tunno* v. *Happoldt, supra*, had never been changed. It may be added that the rule laid down in *Edwards* v. *Sanders* cannot be considered as within the description of the words *communis error facit jus*, because McGowan, A. J., in the opinion in the case of *Piester* v. *Piester*, states substantially that the profession in the State had never accepted that rule as sound construction.

The rule, therefore, as stated in *Piester* v. *Piester* is binding upon this court, and there is nothing to take the mortgages in this case from under its operation. It follows that the mortgages here must take rank as against the assets in the hands of the administrator according to the nature of the instruments the mortgage was given to secure, and that the specific lien of the mortgages having been exhausted, they are no longer preferred claims as mortgages. I have not discussed the facts relating particularly to the mortgage set up by Mr. Kerr, because he can stand at least on no better ground than the other mortgage, his mortgage having been executed before the decision in the case of *Edwards* v. *Sanders* was filed.

From this decree, Hopkins, Dwight & Trowbridge appealed upon the following grounds:

I. For that his honor, the presiding judge, held that the lien of the mortgage held and owned by Hopkins, Dwight & Co.'s successor has been exhausted, and that the debt secured thereby is no longer a preferred claim, and can only be proved and take rank against the assets in the hands of the administrator, according to the nature of the instrument evidencing the debt and the statute relating thereto.

II. For that his honor, the presiding judge, did not hold that the rank given by the referee to the debt, and mortgage securing the same, of Hopkins, Dwight & Co.'s successor, being in accordance with the decision of the Supreme Court in force at the time of the *commencement of the action* and of the *finding* of the referee, must be sustained.

III. For that his honor, the presiding judge, did not hold that the law in force at the *time of the execution of the note and mort-*

*gage* securing the same, and at the time of *the death of intestate*, should determine the rank of the debt as a claim against the estate.

IV. For that his honor, the presiding judge, held that there was no proof that said note and mortgage were executed by the parties with reference to the decision of *Edwards* v. *Sanders;* whereas he should have held that the parties were to *be presumed* to have contracted with reference to the law as expounded by our highest court at the time.

.V. For that the ruling of his honor, the presiding judge, that the rank of appellants' claim should be determined by the decision of *Piester et al., Ex'rs,* v. *Piester et al.,* rendered by the Supreme Court, after the execution of the contract, after the death of the deceased, after the commencement of this action, and after the referee's decision upon the.claim, was giving said decision of *Piester et al., Ex'rs,* v. *Piester et al.,* a force and effect in violation of sec. 10, art. I., of the constitution of the United States.

VI. For that the decision of the Supreme Court in the case of *Piester et al., Ex'rs,* v. *Piester et al.,* as (or if) applied to appellants' claim, is in violation of section 10, article I., of the constitution of the United States.

An appeal was also taken by W. H. Kerr, clerk, and Mrs. Melton and her children, but the grounds are substantially the same as those above stated.

*Messrs. J. H. Rion, A. S. Douglass,* and *S. P. Hamilton,* for appellants.

*Messrs. McLure & McLure, J. F. Hart,* and *Paul Hemphill,* contra.

April 22, 1886. The opinion of the court was delivered by

Mr. Justice McIver. The facts of this case, so far as necessary for a proper understanding of the points made by the several appeals, are substantially as follows: On July 9, 1876, Geo. W. Melton died intestate, and his estate being found to be largely insolvent, this action was commenced in July, 1877, to marshal

the assets. Creditors were called in and numerous claims were established, but the only ones that need be specially stated are the following: a note under seal to G. R. Ratchford & Co., bearing date February 22, 1859; a note under seal to Dr. A. P. Wylie, bearing date May 3, 1872; a note under seal to Samuel D. Melton, bearing date February 1, 1871; a bond, secured by a mortgage of real estate to Duvall, sheriff, dated June 4, 1875, which has been transferred to the defendant, Kerr, as clerk of the court for Fairfield County; and a bond, secured by a mortgage of real estate, to Hopkins, Dwight & Co., dated May 19, 1876.

The mortgage to Hopkins, Dwight & Co. has been foreclosed, and the proceeds of the sale of the mortgaged premises being insufficient to pay the debt, the balance is now set up against the general assets, and preference for it is claimed as a mortgage debt. The land covered by the Kerr mortgage was sold under an order in this cause before Kerr became a party by proving his mortgage debt; and after that sale, Kerr not having got the proceeds, he brought his action to foreclose his mortgage against the purchaser at the sale made under the order in this cause, and the land was again sold, but the proceeds of this last sale being insufficient to pay his debt, the balance is now set up as a mortgage debt against · the general assets. The Circuit Judge held that the liens of the two mortgages having both been exhausted, the rank of these debts must be determined by the nature of the obligations which they were given to secure, and cannot be classed as mortgages. The appellants question the correctness of this ruling, and the defendant, Kerr, also appeals upon the ground that the Circuit Judge erred in not holding "That so much of the proceeds arising from the sale of the mortgaged premises under the order of the court in this action as are in the hands of the clerk of this court be applied to said mortgage debt."

In relation to this last mentioned ground of appeal, we have only to say that we are unable to discover where any such question was made in the court below. It does not appear that the referee ruled, or was asked to rule, upon it, and no such question was considered or passed upon by the Circuit Judge, and therefore we do not see how we can consider

it. There is nothing in the "Case," as prepared for argument here, to show that an order directing the proceeds of the first sale to be applied to the Kerr mortgage was ever applied for. Whether such an order should be granted, or whether Kerr has elected to ignore the first sale by bringing his action to foreclose his mortgage against the purchaser at such sale, and thereby lost the right to claim the proceeds, or whether the purchaser at that sale may not have equities which entitle him to be heard, are all questions upon which we do not desire to be understood as intimating any opinion, inasmuch as we do not think the question presented by this ground of appeal is properly before us.

The Circuit Judge based his decision upon the main point involved in these appeals, that is, as to the rank of the claims of Hopkins, Dwight & Co. and Kerr, clerk, upon a recent decision of this court in the case of *Piester* v. *Piester* (22 *S. C.;* 139); and there can be no doubt that if that case applies to this, it fully sustains the decree of the Circuit Judge. The appellants, however, contend that the case of *Piester* v. *Piester* cannot be so applied, for the reason that to so apply it would impair the obligation of contracts or would divest vested rights, inasmuch as at the time of the death of the intestate, and at the time of the making of one of the contracts in question—that of Hopkins, Dwight & Co.—the law, as then declared by the case of *Edwards* v. *Sanders* (6 *S. C.*, 316), required that the balances due on these two debts should be ranked as mortgages, and as such entitled to priority over specialty debts; and that the subsequent change in the law, as it is called, by the decision in *Piester* v. *Piester*, cannot have the effect of divesting the rights of these appellants which became vested at the time of the death of the intestate, under the law as it was then declared to be.

For a clearer understanding of the questions raised, it may be well to repeat here the dates of the several transactions and matters referred to. The date of the sealed note to Ratchford & Co., one of the respondents, is February 22, 1859; the sealed note to S. D. Melton, February 1, 1871; the sealed note to Wylie, May 3, 1872; the Kerr bond and mortgage, June 4, 1875; the bond and mortgage to Hopkins, Dwight & Co., May 19, 1876; the death of the intestate, July 9, 1876; the decision

in the case of *Edwards* v. *Sanders* was filed October 14, 1875,
though the book of reports in which it is found was not published
until some time in the year 1877; and the decision in the case of
*Piester* v. *Piester* filed January 10, 1885, and the decree appealed
from May 20, 1885.

The construction which is now placed upon the statute pre-
scribing the order in which the debts of a decedent must be paid
is the same as that which was adopted by the law court in the case
of *Tunno* v. *Happoldt* (2 *McCord*, 188), as far back as 1822, and
reaffirmed by the Court of Equity in the case of *Kinard* v.
*Young* (2 *Rich. Eq.*, 247), in 1846. Thus the law stood unques-
tioned, so far as we are informed, down to the year 1875, when
the decision in *Edwards* v. *Sanders*, *supra*, was made, overruling
the two former cases, and placing upon the statute the construc-
tion now contended for by the appellants. This last named deci-
sion does not seem to have been followed in a single instance;
and from what is said in the case of *Piester* v. *Piester*, it would
seem to have been never satisfactory to the profession, and that,
at the first opportunity which was afforded, it was overruled, the
legislature, in the meantime, having, by the act of 1878 (16
*Stat.*, 686), shown its dissatisfaction with the construction therein
adopted by declaring: "That in the administration of the assets
of a decedent, mortgages shall not be entitled to a priority over
rents, debts by specialty, or debts by simple contract, except as
to the particular parts of the estate affected by the liens of such
mortgages. That after the property covered by the liens is
exhausted, the grade of the demand shall be determined by the
nature of the instrument which the mortgage was given to secure."
It is true that in the case of *Piester* v. *Piester*, no express refer-
ence is made to the difference in the phraseology of the original act
of 1789 and that adopted when it was incorporated in the general
statutes of 1872, upon which stress seems to be laid in the argu-
ment of one of the counsel for appellants, but the whole subject
was carefully considered before any conclusion was reached. Nor
do we find in the case of *Edwards* v. *Sanders* that any allusion
was made to such change in the phraseology as a reason for a
change in the construction of the act.

The question, then, is, does the decision in the case of *Piester*

v. *Piester* effect such *a change in the law* as would forbid its application to the case under consideration, because it would impair the obligation of a contract or would divest rights vested under the law as declared in the case of *Edwards* v. *Sanders?* As we have seen, the proper construction of the statute in question had been settled, for a long series of years, by decisions of both the courts of final resort in this State, in accordance with the view now declared to be the proper construction of that statute; and it seems to us that it would be going very far to say that a single isolated decision, never recognized or followed in any subsequent case, and never recommending itself to the approval of the profession, should be regarded as having the effect of *changing the law;* on the contrary, whatever may be the opinions of individuals as to its correctness, it must be regarded as an erroneous declaration of what was the law, and as only the law of the particular case in which it was made.

We do not think that the case of *Herndon* v. *Moore* (18 *S. C.,* 339), relied on by the appellants, is applicable here. In that case, there were many potential elements, such as long and universal acquiescence, sales made, and money paid, which are not found here. Moreover, it will be observed that the majority of the court concurred only in the result, and hence that case can only be regarded as authority on the precise question therein adjudged, as presented under the special circumstances therein stated.

It is true that the Supreme Court of the United States have, in numerous cases, held that where a contract is valid at the time it is made, under the laws of the State as then expounded, its validity or obligation cannot be impaired by any subsequent judicial decision giving a different exposition of the law; and this court has, in two cases (*The Bond Debt Cases,* 12 *S. C.,* 282, and *Whaley* v. *Gaillard,* 21 *Id.,* 572), deferred to the authority of that court in that class of cases which involve the question whether a particular law or decision is in violation of that clause of the constitution which forbids a State from passing any law impairing the obligation of a contract. But even in the Supreme Court of the United States this doctrine is confined to cases of contract, and even in such cases it is, at least, doubtful whether it would be

applied where, at the time the contract was made, the law had been declared only by a single isolated case, never recognized or followed, and overruled at the first opportunity presented. See the cases of *Ohio Life and Trust Co.* v. *Debolt*, 16 *How.*, 432; *Gelpcke* v. *Dubuque*, 1 *Wall.*, 175; *Lee County* v. *Rogers*, 7 *Id.*, 181; *Butz* v. *City of Muscatine*, 8 *Id.*, 575; *The City* v. *Lamson*, 9 *Id.*, 477; *Olcott* v. *The Supervisors*, 16 *Id.*, 678.

Assuming, then, for the sake of the argument only, that there was a change in the law by the decision in the case of *Piester* v. *Piester*, before the doctrine above cited from the Supreme Court of the United States could be applied in this case, it must appear that this is a case of contract, and that to give effect to such change in the law would impair the obligation of such contract. We do not see that the law, as declared in *Piester* v. *Piester*, impairs or in any way affects the validity or obligation of any contract. It does not purport to interfere in any respect with the validity or binding obligation of any contract set up by the appellants. It simply declares the proper construction of a statute prescribing the order in which the debts of a decedent are to be paid.

In *Harrison* v. *Sterry* (5 *Cranch*, 289), the question was as to the right of the United States to priority under an act of congress. It was contended that as the contract was made with foreigners, in a foreign country, the law of the place where the contract was made must govern, and under that law no such priority was recognized. But the court held otherwise. Marshall, C. J., while recognizing the doctrine that the *lex loci contractus* governed in expounding the contract, adds: "But the right of priority forms no part of the contract itself. It is extrinsic, and is rather a personal privilege dependent on the law of the place where the property lies and where the court sits which is to decide the cause. In the familiar case of the administration of the estate of a deceased person, the assets are always distributed according to the dignity of the debt, as regulated by the law of the country where the representative of the deceased acts, and from which he derives his powers, not by the law of the country where the contract was made." This language is quoted with approval in the subsequent case of *Smith* v. *Union Bank of Georgetown*, 5 *Peters*, 518.

We do not see, then, how any change in the law prescribing the order in which debts of a decedent are to be paid can be said to impair the obligation of any contract by which such debts were created. But even if such should be the case, it seems to us that the practical result in this case would be the same as that reached by the Circuit Judge. For if, as we concede, parties are to be presumed to contract with reference to the law as it exists at the time the contract is entered, and if the law fixing the order in which debts of a decedent are to be paid enters into and forms a part of the contract by which such debts were created, then it follows necessarily that the respondents, Ratchford & Co., Dr. Wylie, and S. D. Melton, whose debts were created at a time when, under the decisions of *Thunno* v. *Happoldt* and *Kinard* v. *Young*, they were entitled to priority over the appellants, they could not be deprived of such priority by the subsequent change in the law, as it is called, by the decision in the case of *Edwards* v. *Sanders*, for the fact that the intestate did not die until after the so called change was made could not affect the validity of contracts made before that time; for certainly a circumstance occurring after a contract has been made cannot be said to enter into or form a part of such contract.

But, as we have said, we do not see that any change in the law prescribing the order for the payment of the debts of a decedent can be properly said to impair the obligation of any contract; and, therefore, whatever other objection may be urged, it is not amenable to the charge that it violates those clauses of the constitution of this State and the United States which forbid the passage of laws impairing the obligation of contracts.

It is contended, however, that upon the death of a decedent, the rights of his creditors to the payment of their debts, according to the law then in force, become vested, and that such vested rights cannot be impaired or taken away by any subsequent change in the law. Applying this doctrine to the facts of this case, appellants insist that under the law, as it was declared to be by the case of *Edwards* v. *Sanders*, at the time of the death of the intestate, they were entitled to priority, and that any subsequent change in the law cannot deprive them of such priority. Without repeating here what we have said above (that we do not

assent to the fundamental proposition upon which the doctrine contended for rests, to .wit, that the law ever was as it was incorrectly announced to be in *Edwards* v. *Sanders*), we will, for the sake of argument only, assume the contrary, and proceed to consider the question whether the appellants can claim such vested right of priority as that it cannot be divested by any change in the law.

. We do not understand that there is anything in the constitution of the United States which forbids a State from enacting a retrospective law, or a law divesting a vested right, provided in so doing the obligation of a contract is not impaired.    *Watson* v. *Mercer*, 8 *Peters*, 88; *Jackson* v. *Lamphire*, 3 *Id.*, 280; *Satterlee* v. *Matthewson*, 2 *Id.*, 380; *Charles River Bridge* v. *Warren Bridge*, 11 *Id.*, 420; *Curtis* v. *Whitney*, 13 *Wall.*, 68. Nor is there any provision in the constitution of this State, as in some of the other States, forbidding the enactment of retrospective laws, or any provision which, in express terms, forbids the enactment of a law divesting vested rights, though certain safeguards are thrown around such rights by the provisions of sections 14 and 23 of article I. of the constitution.

In the case of *Miles* v. *King* (5 *S. C.*, 146), it was held that the act of 1866, which required all instruments in writing of which a record is required by law, and of which the record has been lost or destroyed, but the original preserved, to be again recorded within a specified time; otherwise, that they should not prevail as liens against subsequent purchasers or creditors without notice, was a constitutional and valid law.    Now, in that case the plaintiff, by recording his mortgage, which was executed in 1855, under the law then of force, had acquired a vested right, so to speak, of priority over all subsequent purchasers and creditors, and yet it was held that such vested right was divested by his failure to comply with the requirements of the subsequent act of 1866.    In delivering the opinion of the court in that case, Moses, C. J., uses this language : "The general assembly has power to divest vested rights, and to enact statutes retrospective in their action, provided they do not impair the obligation of a contract." And again: "A vested right may be divested by the legislature, unless it exists by virtue of or in the nature of a contract."

Now, while we are not prepared to indorse this language without some qualifications, as it would, in its unqualified form, imply that the legislature had power to divest a vested right of property; yet we agree that every vested right, so-called, is not beyond the reach of the legislature. It is very difficult, if not impossible, to define precisely those rights which are so vested as to be protected from legislative interference, as is shown in the discussion of this subject by that eminent author, Judge Cooley, in his work on Constitutional Limitations, and we shall not undertake to do so on the present occasion. It is sufficient for us to say, that the right of priority given to certain classes of creditors by the statute prescribing the order in which the assets of a decedent's estate shall be applied to the payment of his debts is a mere direction to the executor or administrator, as the case may be, as to the manner in which he shall administer such assets, which is at all times subject to legislative control, and does not confer any such vested right upon the creditors as to place it beyond such control.

This seems to have been the principle upon which the Supreme Court of the United States acted in *Bank of Hamilton* v. *Dudley,* 2 *Peters,* 492. In that case, an act of 1795, which seems to have been of force at the time of the death of the intestate, and at the time letters of administration upon his estate were granted, authorized administrators to sell lands for the payment of debts. This act was repealed on June 1, 1805, and in August following the Court of Common Pleas granted an order authorizing the administrators to sell the land in controversy, who proceeded to do so, and the question was as to the validity of the sale. It was contended on the part of the plaintiffs in error that the interest of the administrators in the real estate, as trustees for the creditors, was a vested interest, which the repeal of the law could not divest. But the court held otherwise, and Marshall, C. J., in delivering the opinion, used this language: "The repeal of such a law divests no vested estate, but is the exercise of a legislative power which every legislature possesses. The mode of subjecting the property of a debtor to the demands of a creditor must always depend on the wisdom of the legislature."

It is not to be denied that some of the language used by that

distinguished jurist, Johnston, Ch., in the case of *Morton &
Courteny* v. *Caldwell* (3 *Strob. Eq.*, 161), when considered apart
from the question then under consideration, does seem to support
the view contended for by the appellants. But the question in
that case was so wholly different from the one now under consid-
eration, that to apply the language there used to a totally differ-
ent question would inevitably lead us into error. The question
there was, to what period of time must we look in order to ascer-
tain the amount of a claim against a decedent's estate, in order to
determine its *pro rata* share of the assets of such estate, and the
question now before us, as to whether the law-making power could
not change the direction previously given as to the manner of
administering the assets of a decedent's estate, was not considered
or even hinted at. We do not see, therefore, that there was any
error, in any respect, in the judgment appealed from.

The judgment of this court is, that the judgment of the Circuit
Court be affirmed.